**VALLE MAKOFF LLP**
JEFFREY B. VALLE (State Bar No. 110060)
  jvalle@vallemakoff.com
SUSAN L. KLEIN (State Bar No. 115927)
  sklein@vallemakoff.com
JENNIFER LASER (State Bar No. 192700)
  jlaser@vallemakoff.com
11911 San Vicente Blvd., Suite 324
Los Angeles, California 90049
Telephone:    (310) 476-0300
Facsimile:    (310) 476-0333

**GREG VICTOROFF & ASSOCIATES**
Greg Victoroff, Esq. (State Bar No. 089688)
11355 West Olympic Blvd., Ste. 300
Los Angeles, CA 90064
(310) 207-8999

Attorneys for Plaintiff
Duncan Lindsey Ph.D

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DUNCAN LINDSEY, PH.D, <br><br> Plaintiff, <br><br> v. <br><br> ELSEVIER INC., ELSEVIER B.V., ELSEVIER, LTD, and DOES 1-10, inclusive, <br><br> Defendants. | CASE NO. 3:16-cv-00959-GPC-DHB <br><br> **JOINT MOTION FOR DETERMINATION OF DISCOVERY DISPUTE TO COMPEL ELSEVIER TO PRODUCE FINANCIAL DATA FOR PLAINTIFF'S EXPERTS AND TO EXTEND DEADLINE FOR SUBMISSION OF EXPERTS' REPORTS** <br><br> **REDACTED** <br><br> Judge: Hon. Gonzalo P. Curiel <br> Magistrate: Hon. David H. Bartick <br><br> Complaint Filed: March 17, 2016 |

The parties hereby submit the following Joint Motion for Determination of Discovery Dispute regarding Production of Financial Data and Extending Deadline for Expert Reports.

1    I.      **PLAINTIFF DUNCAN LINDSEY'S POINTS AND AUTHORITIES**

2            A.      **Declaration of Compliance with Meet and Confer Requirements**

3            The parties have met and conferred in compliance with Local Rule 26.1(a)

4    and the Court's Civil Chambers Rules, but have been unable to resolve this dispute.

5    See Declaration of Jeffrey B. Valle in Support of Joint Motion ("Valle Decl.").

6            B.      **Introduction**

7            Plaintiff Dr. Duncan Lindsey, Ph.D., brings this motion to compel Elsevier

8    to produce data essential for his expert to conduct his damages analysis, and to

9    extend the deadline for his experts to submit their reports.  Elsevier's refusal to

10   provide damages data requested by Dr. Lindsey during Phase I discovery

11   necessitated two motions to compel.  When the Court denied those motions

12   without prejudice to renew them later in the case and opened up all discovery on

13   January 27, 2017, and Dr. Lindsey immediately requested total revenue data,

14   Elsevier first agreed to provide it but then, within the last month, reversed its

15   position and is refusing to do so. Elsevier's sharp litigation tactics and refusal to

16   provide the key data it previously agreed to produce necessitates this motion,

17   which is Dr. Lindsey's 3rd motion to compel Elsevier's financial data in 9 months.

18           Dr. Lindsey brought this lawsuit over a year ago, seeking unpaid royalties

19   from Elsevier.  He created the academic journal, *Children and Youth Services*

20   *Review* ("CYSR") and has edited that journal for almost 40 years.  Despite

21   Elsevier's contractual obligation to pay him 15% of net subscription revenues

22   from CYSR (after reaching a threshold of 750 institutional subscriptions),

23   Elsevier has not paid him a penny of royalties.  Elsevier's excuses for non-

24   payment have ranged from the frivolous to the absurd, claiming for example that

25   electronic subscriptions do not count even though virtually the entire industry has

26   moved to electronic subscriptions and his contract contains no such limitation.

27           Elsevier sells its many journals by entering into ***package deals***, whereby its

28   customers pay a total price and in return receive a package of individual journals

1   plus a bundle of additional journals, referred to as Collections.  Elsevier includes

2   CYSR in the Collections it sells to its customers but paid no royalties to Dr.

3   Lindsey from those sales or any other sale of subscription access to CYSR.

4          The key damages issue in the case is how revenues from these *package*

5   *deals* should be allocated to CYSR.  To conduct a proper allocation analysis, Dr.

6   Lindsey's experts, at a minimum, need: (1) total annual revenue received from

7   each Elsevier customer for each *package deal* that provided access to CYSR; and

8   (2) article download and citation data for each Elsevier journal.  Total revenue is

9   the starting point for the allocation. The download and citation data indicate the

10  relative value of each journal so that the revenue can properly be allocated.

11         Elsevier has agreed to produce the second category of data, thus

12  recognizing that the allocation analysis requires a comparison of the download

13  and citation data *for all journals*.  But Elsevier has recently changed its position

14  on the revenue issue, refusing to produce the total revenue received from each

15  customer from each package deal that included access to CYSR.  Elsevier is

16  refusing to produce the total amount of the pie to be allocated, thus depriving Dr.

17  Lindsey and his expert of absolutely critical information needed to conduct a

18  damage calculation. *See* Declaration of Mark McCabe ("McCabe Decl.") ¶¶ 4-7.

19          Production of this data is not unduly burdensome to Elsevier since it

20  obviously tracks the total revenues it receives from each of its customers.  Nor is

21  confidentiality a reasonable objection here. There is a Protective Order in place,

22  Dr. McCabe has agreed to abide by it, and Elsevier has expressly agreed that Dr.

23  McCabe can review its confidential materials.  Any confidentiality/privacy issue

24  is outweighed by the direct and critical relevance of the data sought.  Indeed, until

25  a few weeks ago Elsevier promised to provide this revenue data, thus undermining

26  its assertions now that the requests are improper or objectionable.

27         Most recently, Elsevier responded to Dr. Lindsey's attempt to get this

28  critical information by repeating the mantra that Elsevier has produced thousands

of pages of materials and a report that contains some of the information he seeks. This is a dodge. Volume of production is irrelevant. What Dr. Lindsey seeks is very specific – total revenues, by year, from each Elsevier customer that purchased paid access to CYSR through a package deal memorialized in a single agreement. ***The report that Elsevier refers to does not contain this information.*** (McCabe Decl. ¶ 6).  Elsevier has no right to dictate methodology for revenue allocation in this case.  That will be the subject of conflicting expert testimony and is ultimately for the jury to decide. Dr. Lindsey has diligently sought this information, but Elsevier has obstructed all efforts to obtain it.  Dr. Lindsey therefore requests that the Court compel its production.

In addition, because Dr. Lindsey's experts do not have the data they need to conduct their analyses and prepare their expert reports, Dr. Lindsey also asks the Court to extend the deadline to submit expert reports.  Indeed, even apart from the revenue data sought here, Elsevier did not produce the voluminous download and citation data until late last week, and Dr. Lindsey's experts need sufficient time to review it and incorporate it in their analysis.  Also, Elsevier has advised that it would not be able to complete its production of the 2016 citation data until the end of August. (Valle Decl. ¶ 20).  Dr. Lindsey respectfully requests that the Court order Elsevier to complete production of revenue and citation data by the end of August and allow his experts until October 15 to prepare their reports.

## C.    The Requests At Issue

The Requests at issue seek *total* annual revenue from each Elsevier customer with access to CYSR, which is the starting point, and critical to Dr. Lindsey's ability to conduct an allocation analysis calculating what portion of this revenue should be allocated to CYSR.  The requests at issue are set forth below.[1]

---

[1] Elsevier has failed properly respond to other discovery requests, and has been slow to produce what it promised to produce. For example, it still has not

- **RFP No. 1 (revised Set No.1, served 2/2/17) (Valle Decl., Ex. 1)**[2]

For each year from 2006 to the present, DOCUMENTS sufficient to show the total gross annual income ELSEVIER received from INSTITUTIONS pursuant to ESAs [Electronic Subscription Agreement] that included access to the Journal.

- **Interrogatory No. 1 (Revised Set No. 1, served 2/2/17) (Exhibit 2)**

For each ESA from 2006 to the present that included ACCESS to the Journal, state the total gross income ELSEVIER received pursuant to that ESA during each year.

- **RFP No. 50 (Set No. 4, served 5/31/17) (Exhibit 11)**

For each ELSEVIER CUSTOMER for each year from January 1, 1997 through May 30, 2017, DOCUMENTS providing data showing the annual revenue received by ELSEVIER for online access to content contained in the Science Direct database, denominated in the currency used by the CUSTOMER.[3]

### D. Elsevier Sandbagged Dr. Lindsey By Agreeing To Produce, Then Changing Its Position Four Months Later

Dr. Lindsey has been attempting from the beginning of the case to obtain the data he needs to conduct a full analysis of his damages.  But Elsevier has been obstructionist throughout this process.  Initially, the parties stipulated to divide discovery into two phases, the first focused exclusively on the financial information he needs to properly assess his damages.  After agreeing to this approach, Elsevier refused to provide the revenue and other data requested by Dr. Lindsey, forcing him to bring two motions to compel that data. [4]

---

produced usage data for 1997 to 2008.  Dr. Lindsey has focused this motion on the most critical information needed for expert reports (i.e. revenue data), without waiving his right to seek to compel additional information withheld by Elsevier.

[2] All Exhibits in Dr. Lindsey's portion of this Motion are to the Declaration of Jeff Valle, and all references to "Ex" are references to the exhibits to his declaration.

[3] To be clear, Dr. Lindsey is only seeking total revenues from Elsevier customers who had access to CYSR during the relevant years.

[4] Elsevier asks on page 20 of this Motion: "If something needed for Lindsey's expert reports was missing from the September/October 2016 … spreadsheets,

1    Instead, Elsevier sought to have discovery bifurcated *in the opposite way* –

2    to have financial discovery put off until after Elsevier brought a summary

3    judgment motion. The Court rejected Elsevier's request and instead opened up

4    discovery on all issues on January 25, 2017.  *See* Valle Decl. ¶ ¶ 2-3.

5    Following the Court's ruling, Dr. Lindsey immediately propounded a

6    document request and interrogatories seeking the total revenue Elsevier has

7    received from each customer that purchased access to CYSR, to allow Lindsey to

8    perform a damages analysis and calculation.  See RFP 1 and Interrogatory 1,

9    above. *On March 6, 2017, responding to these requests*, *Elsevier agreed to*

10   *produce documents that included this information, but claimed it would take*

11   *time to complete this production.* *See* Elsevier's Response to RFP 1, Ex. 3

12   (following objections, it stated "*Elsevier will produce responsive, non-privileged*

13   *documents sufficient to respond to this request* to the extent they are located after

14   a reasonable search and diligent inquiry." (Emphasis added); *see* Elsevier

15   Response to Interrogatory 1 in Ex. 4 (following objections, stating: "*Elsevier will*

16   *produce documents from which this information can be derived* and will

17   supplement this response with Bates numbers once that production has been

18   completed.") (Emphasis added); Elsevier Response to Interrogatory 2 (same). *Id*.

19   After retaining his damages expert, Mark McCabe, and still waiting for

20   Elsevier to produce the revenue data it had promised to produce, Dr. Lindsey

21   served a follow-up document request that sought the same type of revenue

22   information, but for the period 1997 to date, and in a slightly different format,

23   requested by the expert. (RFP No. 50, above.)  Elsevier served its written response

24

25   _____

26   why did Lindsey wait until July 19 to raise it?"  This question is so false and
     misleading, it is infuriating.  Dr. Lindsey did not wait until July 19.  In November

27   2016, he brought two motions to compel (DN 24 and DN 30) based on the
     insufficiency of the data in those spreadsheets and asking this Court to compel
     revenue and other data that was missing from those spreadsheets. The Court

28   denied those motions <u>without prejudice</u> to renew them during Phase II discovery.

1    on June 30, 2017, which stated that "it has already produced a report, going as far

2    back as such data is reasonably accessible, showing each CYSR customer, the

3    customer's address, the products purchased year and year, and the price paid."

4        Because Dr. Lindsey and his counsel were expecting Elsevier to produce

5    data of all revenue from every customer that purchased access to CYSR, including

6    the revenue for all of the journals, as it had previously agreed to do in response to

7    RFP 1 and Interrogatory 1 and 2, they did not immediately realize that Elsevier

8    changed its position on this key issue and limited its revenue production to CYSR.

9    However, during meet and confer, Elsevier's counsel clarified Elsevier was only

10   producing revenue data for CYSR and collections containing CYSR, and not for

11   the entire deal that included access to CYSR.  (Valle Decl. ¶¶ 15-16).  Elsevier

12   then served a document titled "Supplemental Responses" to interrogatories, but

13   which in fact contained a complete reversal of Elsevier's prior response that it

14   would provide all requested revenue data.  (*Id.*, Ex. 14).  Where the original

15   responses promised to produce documents with information on "total income"

16   derived from the entire deal that included CYSR, the "supplemental responses"

17   referred to a recently produced report that was limited to CYSR revenue.  (*Id.*)

18   Dr. Lindsey's counsel met and conferred with Elsevier's counsel on this issue, but

19   Elsevier refused to change its position. (Valle Decl. ¶¶18-18, Exs. 15,16).

20       ***This report does not contain the data requested in RFP 1, Interrogatory 1***

21   ***and RFP 50.***  (McCabe Decl. ¶ 6).  Thus, shortly before expert reports are due,

22   Elsevier has sandbagged Dr. Lindsey in a most egregious way, suddenly refusing

23   to produce critical, highly relevant data that it has been promising for months to

24   produce.  This is unreasonable, and improper.  Interestingly, to date Elsevier has

25   not supplemented its response to RFP 1, which still promises to produce this data.

26       Dr. Lindsey and his experts need the complete revenue data to calculate

27   damages and to prepare expert reports.  Dr. Lindsey seeks the Court's help in

28   compelling Elsevier to produce what is needed and what Elsevier promised to

1  provide (before its abrupt and recent change of position).  Dr. Lindsey will be

2  severely prejudiced if this discovery is not compelled from Elsevier.

3       **E.**     **Elsevier's Objections Are Unfounded**

4      **Relevance.**  Elsevier claims the data sought is not relevant or reasonably

5  calculated to lead to the discovery of admissible evidence.  According to Elsevier,

6  the only relevant revenue data is revenue *Elsevier* attributes to CYSR

7  subscriptions and to Collections that include CYSR.  Dr. Lindsey and his damages

8  expert, however, reject Elsevier's narrow self-serving position on what revenues

9  should count for allocation purposes.

10      Elsevier sells its journals to customers in package deals for a total price set

11  forth in each Elsevier Subscription Agreement ("ESA"). The total price of these

12  package deals covers individual journals listed, which sometimes include CYSR,

13  plus Collections, which almost always include CYSR.  *See* Ex. 17, an example of

14  an ESA.  From an economic standpoint, it is the ***total price*** that both Elsevier and

15  the customer care about – not how much Elsevier allocates to individual journals

16  or to Collections.  Documents Elsevier and third parties produced show arbitrary

17  allocations by Elsevier of the total price to CYSR subscriptions, which are

18  nonsensical and make no economic sense.



23       (Ex. 18).  Neither these

24  arbitrary variations in number of subscriptions nor the multiplicity of electronic

25  subscriptions to the same journal for the same customer make much sense.

26  ***Notably, Elsevier's opposition does not address these arbitrary allocations of***

27  ***varying numbers of subscriptions to journals within a packaged deal.***

28      Dr. Lindsey is not required to accept Elsevier's arbitrary, non-sensical

revenue allocations of various components of its package deals.  He needs the total amount each customer paid for each deal (which includes individual journals and Collections) so he can appropriately analyze both components and do an economic allocation of the total price paid by each customer to CYSR, based on the relative quality of each journal included in the deal (using, among other things, journal download and citation data).  (McCabe Decl. ¶¶ 4-7).[5]

Elsevier disagrees with this approach, which it calls "inventive" and "novel." But it is not entitled to dictate Dr. Lindsey's damage theory or analysis. It is not allowed to withhold financial information "based upon its unilateral determination of what is 'relevant." *Bryant v. Mattel, Inc.*, 2007 WL 5430893 at 5 (C.D. Cal. 2007).  It cannot impose its damages theory on Dr. Lindsey by withholding data that would allow him to refute it. At the discovery phase, he is entitled to data he needs to pursue his theory of the case and to conduct damages analyses using full revenue data on all deals that included access to CYSR.

Relevance is the thinnest of reeds to try to block such critical discovery. Indeed, all of Elsevier's objections ring hollow because, until recently, it had promised, in formal discovery responses, to produce this revenue data notwithstanding its objections.  It should be ordered to do so forthwith.

**Vague and ambiguous**.  Elsevier also claims the requests are vague and ambiguous, stating, for example, that the terms "online content" and "access" are undefined.  This is ridiculous. The requests seek total annual revenue data for each Elsevier customer who purchased access to CYSR.

**Overly Burdensome.**  Elsevier claims it is unduly burdensome to produce this revenue data. But it cannot show that its burden is so great that Dr. Lindsey should be denied this critical information.  As this court and other California

---

[5]  Contrary to Elsevier's assertion, Dr. Lindsey's expert is <u>not</u> seeking to "re-establish a new price" for CYSR.  Rather, he will use total revenue and usage and citation data to calculate economic value of CYSR within each journal package.

1  federal courts have held, the "fact that production of documents will be time

2  consuming and expensive is not ordinarily a sufficient reason to refuse to produce

3  material if the requested material is relevant and necessary to the discovery of

4  admissible evidence." *Shaw v. Experian Information Solutions, Inc.*, 306 F.R.D.

5  293, 301 (S.D. Cal. 2015); *see Thomas v. Cate*, 715 F. Supp. 2d 1012, 1033 (E.D.

6  Cal. 2010) (finding 111 hours to conduct data review did not amount to undue

7  burden).  Elsevier obviously keeps track of the revenues it receives from each of

8  its customers.  Indeed, until a few weeks ago, Elsevier had promised to produce

9  this data, which proves that its production is not too burdensome. Moreover, ***given***

10  ***the critical nature of the data sought***, Elsevier's burden to show it would be

11  overly burdensome to produce the data is extremely high and cannot be met here.

12  *Green v. Beca,* 219 F.R.D. 485, 493 (C.D. Cal. 2003) (holding that plaintiff's

13  need for requested information outweighed the likely production burden because

14  the information was "critical to plaintiff's ability to prove his case").

15      **Confidentiality/Privacy**.  Elsevier's objection that the data is highly

16  confidential, propriety and trade secret information is meritless since: (1) there is

17  a Protective Order in place, (2) Dr. McCabe has agreed to be bound by it, and (3)

18  Elsevier has expressly agreed that Dr. McCabe may review its confidential

19  documents.  The objection is also disingenuous. Elsevier did not claim this

20  information was too confidential to produce, or a trade secret, when it initially

21  agreed to produce that data in response to RFP 1 and Interrogatories 1 and 2.

22      **F.      Dr. Lindsey Needs An Extension of Time For Expert Reports**

23      Dr. Lindsey still does not have the data he needs for his experts to complete

24  their analysis and reports.  Furthermore, Elsevier has advised that its production of

25  journal citation data for 2016 will not be completed until the end of August.  Also,

26  Elsevier did not produce its voluminous download and citation data until last week.

27  Dr. Lindsey's experts need time to receive and analyze this voluminous data,

28  confirm Elsevier produced what it promised, do their analysis and incorporate it

9

into their reports.  (McCabe Decl. ¶ 8).  The current deadline for expert reports is August 14, 2017.  Dr. Lindsey requests that the Court order Elsevier to produce all revenue data at issue in this motion and the remaining citation data by no later than August 31, and allow his experts 45 days, or until October 15, 2017, to prepare their expert reports.  Otherwise, he will be severely prejudiced by Elsevier's delayed production of data and its last minute refusal to produce relevant revenue data.

**G.    Elsevier Should Be Sanctioned For Its Obstructionist Practices**

Elsevier has obstructed Dr. Lindsey's attempts to obtain relevant financial and damages-related documents since the very beginning of this case.  It has no good faith basis to refuse to produce the revenue data requested in this motion. There is a Protective Order that fully protects any confidentiality issues. The materials are not burdensome to provide and they are highly, critically relevant.

Federal Rule of Civil Procedure 37 provides that a party prevailing on a discovery motion to compel disclosure is entitled to its attorneys' fees.  Moreover, Elsevier promised to produce this revenue data in its written discovery responses, and only recently changed its position shortly before the deadline for filing expert reports. These sharp practices should not be countenanced.

Dr. Lindsey's counsel has spent in excess of 25 hours preparing this motion and the supporting declarations and exhibits, and numerous additional hours meeting and conferring regarding discovery sought here.  Dr. Lindsey seeks sanctions in the amount of $16,125.00, which reflects 15 hours of Jeffrey Valle at $650 per hour and 10 hours of Jennifer Laser at $575 per hour (their standard billing rates) and 5 hours of paralegal time at $125 per hour. (Valle Decl. ¶ 23).

**H.    Conclusion**

For the foregoing reasons, Dr. Lindsey respectfully requests the Court to grant this motion to compel, to extend the deadline for filing expert reports, and to sanction Elsevier in amount of not less than $16,125.00.

## II.   ELSEVIER'S POINTS AND AUTHORITIES

Lindsey's motion to compel seeks revenues for subscriptions to journals that have **nothing to do with CYSR**.  Those other journals are not a part of the CYSR contract, and they do not contain any CYSR content.  Nor are they sold as a "package" with CYSR.  The CYSR contract explicitly limits Lindsey's basis for royalties to "net subscription income **to the journal**," and Lindsey has admitted that he is only entitled to royalties "**only for CYSR or its content** (articles)." Moreover, the CYSR contract unambiguously gives Elsevier the right to determine commercial policy, including pricing and method of distribution, for CYSR. Lindsey's motion, therefore, rests on a premise ("Elsevier has no right to dictate methodology for revenue allocation in this case.") that is demonstrably false.  To the contrary, it is Lindsey who has no right to say Elsevier charged too little or too much for CYSR, no right to object to or make false claims about distribution models, and therefore no right to try to reach into other journal income in hopes of recompense.  Simply put, subscriptions to other journals are completely irrelevant, and there is no justification for a giant, expensive, and abusive fishing expedition on products that have nothing to do with CYSR.

### A.   Introduction

In 1978, Elsevier's predecessor, Pergamon Press, agreed to publish a journal on child welfare (*Children and Youth Services Review* or "CYSR") and appointed a young academic named Professor Duncan Lindsey ("Lindsey") as the editor. Lindsey agreed that Pergamon would own CYSR and have the right to set the commercial policy of the journal.  Pergamon would have the right to sell article content as it saw fit, including setting "subscription rates, reprint prices, method of printing and distribution."  Complaint, Ex. A ("CYSR Contract").  Lindsey agreed that he would receive royalties based *only* on "net subscription income . . . to the journal" and *only* if the annual subscriptions to CYSR met certain thresholds.  *Id.* Lindsey agreed that he was <u>not</u> entitled to royalties on any non-subscription income

11

for CYSR.  *Id.*  ("No payments shall be made to you in respect of other income that we may receive from the journal (e.g. advertising, reprint or page charges, microforms, etc.).")  This meant that if the publisher sold CYSR content by means other than a "subscription to the journal," Lindsey was <u>not</u> entitled to a share of that income.  Furthermore, nothing in the contract remotely suggests that Lindsey would be entitled to share in income derived from subscriptions to journals other than CYSR.

In his motion to compel, Lindsey argues, without any support, that he is entitled to highly sensitive and proprietary revenue information for *subscriptions to other journals* that have nothing to do with CYSR.  These other journals do not contain any CYSR content, and revenue for other journal subscriptions has nothing to do with the prices paid for CYSR subscriptions.  They are not, as Lindsey claims, sold in a "package."  In fact, the contracts themselves show the specific and separate prices paid for each journal subscription.  Declaration of Jennifer Jonak ("Jonak Decl."), Exs. F-K.  Lindsey claims that he cannot prepare his expert reports without information on *other journal subscriptions*, but this makes no sense.  Elsevier has already produced thousands of pages of spreadsheets showing the name, address, and price paid for every single CYSR subscription, as well as whether the subscription was print, electronic or both.  Jonak Decl., ¶¶ 2-4.

In some cases, Elsevier permits subscribers of journals to purchase limited rights access to individual articles from over 1,800 journals (e.g., the Freedom Collection or Subject Collection ("Collections")). The parties disagree about whether a percentage of Collections purchases are a "subscription to the journal," as opposed to "other income . . . from the journal."  However, this is not at issue in this motion, because Elsevier has already produced spreadsheets showing Collection customer names, addresses and prices paid.  *Id.*  Elsevier has also produced the formula that it applies to allocate the revenue from Collections purchases to specific journals, including CYSR, and it has further produced the

12

underlying usage, quality and size data, notwithstanding the clear language in the CYSR contract providing Elsevier with the right to determine commercial policy, including pricing and method of distribution, for CYSR.  Jonak Decl., ¶¶ 14, 22.

Lindsey has had all of the information for CYSR subscriptions since October 2016.  Jonak Decl., ¶ 4.  He has had all of the information for Collections revenues since June 7, 2017, almost two months.  *Id.*  None of this has been hidden. Indeed, Elsevier's counsel specifically reminded Lindsey's counsel repeatedly of these spreadsheets.  There were no complaints from Lindsey or requests that Elsevier supplement them.  *Id.*

Elsevier has gone to great lengths to provide additional information to Lindsey.  Lindsey complains that some of this data was provided "late," but he neglects to mention that he served requests for production for detailed usage and citation data only in his "4th" (actually, 6th) set of requests for production. Elsevier tried to meet and confer with Lindsey to suggest more reasonable, less voluminous and time-consuming means of responding to certain of those requests, all of which were rejected.  At Lindsey's insistence, Elsevier produced this information, which was the equivalent of 12 million pages of documents, only a little over six weeks after Lindsey served his requests.  Jonak Decl., ¶ 6.  It was a herculean effort that required Elsevier to have teams of people working night and day to compile such a massive amount of information in such a short time.  *Id.*  At this point, Elsevier has responded to 44 interrogatories, 112 requests for production of documents, and 20 requests for admission. *Id.*  It is not, as Lindsey suggests, trying to "hide the ball."

**B.    Lindsey's Novel but Baseless "Package Deal" Theory Asks the Court to Ignore the Terms of the CYSR Contract and Authorize Invasive and Irrelevant Discovery On Products Outside the Contract**

Disappointed that the financial information produced to date does not support his claims, Lindsey now tries to seek additional sources for potential damages by

1   claiming that CYSR subscriptions are "packaged" with other journals, but this is

2   both false and belied by the terms of the contracts themselves.

3        First, Lindsey and his expert suggest that customers pay one flat fee for a

4   subscription to CYSR that cannot be distinguished from subscription revenues to

5   other journals, and therefore, the revenues from subscriptions to other journals are

6   "packaged." This is simply not true. Each Elsevier Subscription or License

7   Agreement ("ESA") has an electronic subscription fee and, if applicable, a Freedom

8   Collection fee. The electronic subscription fee is simply a mathematical sum of

9   each separate journal subscription. Jonak Decl., Exs. F-K; Declaration of Leo de

10  Vos ("de Vos Decl."), ¶¶ 4-6. This total amount is not arbitrary, nor does it mingle

11  prices for journals. It is simply the sum of the list prices for each journal to which a

12  customer subscribes, with a volume discount applied. *Id.* Elsevier has produced

13  the journal price lists for all recent years. Jonak Decl., ¶ 22.

14

15

16

17

18                                         Jonak Decl., ¶ 22. If one adds up the list prices

19  of the journals and applies the discount, the electronic subscription fee is simply the

20  total. That does not make the separately priced subscriptions a "package," any

21  more than a grocery store receipt renders each separate item a "package" simply

22  because there is a total listed at the bottom of the receipt.

23

24

25

26                            That is a discount from the standard journal prices, which

27  Elsevier has produced to Lindsey.

28

14

Second, Lindsey asks the Court to disregard the express terms of the contracts so that he can lump revenues from CYSR subscriptions, on the one hand, with subscriptions to completely unrelated journals, on the other hand, that have nothing to do with CYSR and contain no CYSR content.  There exists no basis to permit Lindsey to override the prices set for CYSR (and other journals) by trying to merge all subscriptions together and then re-establish a new price based upon his economist's opinions as to the desired "value" of CYSR.  This not only contradicts the terms of the ESAs, but it also contradicts the terms of the CYSR Contract, which granted Elsevier the right to set commercial policy for CYSR, "including **subscription rates**, reprint prices, method of printing, and distribution." Complaint, Ex. A, ¶ 4 (emphasis added).   The premise underlying Lindsey's motion ("Elsevier has no right to dictate methodology for revenue allocation in this case.") is therefore flat out wrong. Speculation as to customers' motivations and desires have no legal import as to the express (and integrated) terms of the contracts – or Elsevier's entitlement to set prices.

Where a contract grants a publisher discretion over pricing or licensing terms, under both California and New York law, a plaintiff cannot claim that its royalty rights were improperly diminished by the commercial decisions of that publisher.  That is so even if the decisions wind up reducing the amount of the plaintiff's royalty entitlement.  *19 Recordings Ltd. v. Sony Music Entertainment*, 165 F. Supp. 3d 156, 160-66 (S.D.N.Y. 2016) (motion to amend complaint denied where contract gave Sony the right to license songs on terms in its own discretion, and plaintiff's theory that Sony could not license under terms that reduced plaintiff's royalty rights contradicted express contractual rights of Sony, and thus could not be altered through the implied covenant of good faith and fair dealing); *Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1120-23 (2008) (court properly directed verdict for Disney on claim that it violated the implied

1  covenant by entering into non-monetary licenses and thereby depriving plaintiff of

2  royalties, where license gave Disney the right to license as Disney "saw fit").

3       Here, the CYSR contract unambiguously grants Elsevier the right to set

4  subscription rates, and Lindsey himself has acknowledged in binding admissions

5  that he is only entitled to "subscription income **for CYSR or its content** (articles)."

6  Jonak Decl., Ex. A (Supp Resp to RFA 3).  Revenue for subscriptions to other

7  journals are completely irrelevant, burdensome to collect, and constitute trade

8  secrets.  Consequently, Lindsey's motion should be denied.

9       **C.    The Revenue Data Is A Trade Secret Privileged from Disclosure**

10      Lindsey does not dispute that revenue data for subscriptions to other journals

11  is a trade secret.  Numerous courts have held that "[c]ustomer information such as

12  sales history and customer needs and preferences constitute trade secrets."  *Henry*

13  *Schein, Inc. v. Cook*, 191 F. Supp, 3d 1072, 1077 (N.D. Cal. 2016).  *See also MAI*

14  *Sys. Corp. v. Peak Computer, Inc.,* 991 F.2d 511, 521 (9th Cir. 1993) (holding that a

15  customer database, which was a "valuable collection of data assembled over many

16  years that allows MAI to tailor its service contracts and pricing to the unique needs

17  of its customers" is a trade secret).  California law recognizes a statutory privilege

18  against the disclosure of a trade secret. mere relevance is not enough to warrant

19  production. "[T]he owner of a trade secret has a privilege to refuse to disclose the

20  secret, and to prevent another from disclosing, if the allowance of the privilege will

21  not tend to conceal fraud or otherwise work injustice." Cal. Evid. Code § 1060.

22      Here, just as in the *MAI* case, Elsevier's collection of data regarding its

23  customers' subscriptions and subscription revenues are a trade secret.  Elsevier's

24  Head of Pricing confirms that:  (1) Elsevier considers the details of its sales to

25  customers, including to what journals they subscribe, and the overall amounts they

26  spend, to be confidential, particularly when encompassed within a single report that

27  would provide insights into Elsevier's overall journal sales and subscriptions that

28  few individuals even within the company can access; (2) Elsevier protects the

16

1    confidentiality of this information by restricting its availability to all but a handful

2    of high level employees within the company and keeping such data on a system that

3    is password protected, encrypted and recorded using the highest security protocols.

4    Even for sales persons, only a limited amount of this data is available for a subset

5    of customers; (3) Elsevier has never produced the information sought to anyone

6    outside the company; (4) Elsevier's customer relationships have been carefully

7    cultivated and maintained at a significant cost, and the data it has compiled

8    regarding customer subscription preferences and sales are proprietary.  This

9    proprietary data provides Elsevier with a competitive advantage that benefits it

10   economically; (5) if this information was leaked, even inadvertently, to a

11   competitor, or shared among customers, particularly for an oversight report that

12   permits overall comparisons of subscriptions and revenues for Elsevier's entire

13   customer base, it would be devastating for Elsevier's business and cause irreparable

14   injury to its publishing business.  de Vos Decl., ¶¶ 8-12.

15        Once a trade secret has been shown, the party seeking discovery must make a

16   "particularized showing that the information sought is relevant and necessary to the

17   proof of, or defense against, a material element of one or more causes of action

18   presented in the case, and that it is reasonable to conclude that the information

19   sought is essential to a fair resolution of the lawsuit." *Bridgestone/Firestone, Inc. v.*

20   *Superior Court*, 7 Cal. App. 4th 1384, 1393 (1992) (even though trade secret

21   regarding tires would be helpful to plaintiff"s expert and was therefore relevant, the

22   privilege against disclosure prevailed since the trade secret was not essential).

23        Similarly, even absent California privilege, once a party has demonstrated

24   the existence of "trade secret or other confidential research, development, or

25   commercial information," under Rule 26(c)(7), the burden is shifted to the party

26   seeking disclosure to demonstrate "that the information is *relevant* to the subject

27   matter of the lawsuit and is *necessary* to prepare the case for trial." *In re*

28   *Remington Arms Co., Inc.,* 952 F.2d 1029, 1032 (8th Cir. 1991) (emphasis

added); *Hartley Pen Co. v. United States Dist. Court,* 287 F.2d 324, 331 (9th Cir.1961) ("[T]he burden rests upon the party seeking disclosure to establish that the trade secret sought is relevant and necessary to the prosecution or the defense of the case before a court is justified in ordering disclosure.")). Discovery is only proper where both relevance and need have been shown. *In re Remington Arms Co., Inc.*, 952 F.2d 1029, 1032 (8th Cir. 1991); *Frank Brunckhorst, LLC v. Ihm*, 2012 WL 12868292, at *6 (S.D. Cal. 2012).

Here, Lindsey has shown no relevance, much less has he shown that it is essential or necessary to prove his claims. As discussed above, the CYSR Contract is clear that Lindsey is only entitled to "net subscription income **to the journal.**" Complaint, Ex. A, ¶ 6; see also Jonak Decl., Ex. A (Supp. Resp. to RFA 3) Lindsey admits that he is only entitled to "**subscription income only for CYSR or its content** (articles)." The CYSR contract unambiguously provides Elsevier with the right to determine the commercial policy, including pricing and method of distribution, of CYSR. Lindsey has asserted no plausible legal basis to engage in a false, self-serving re-allocation of revenues from other journals to CYSR. To do so would essentially allow him to dictate to Elsevier the commercial policy of CYSR—as well as the commercial policy for journals to which Lindsey has no relationship—contrary to the express terms of the CYSR contract.

Lindsey falsely claims that subscription rates for CYSR are inextricably mingled with subscription rates for other journals. As discussed in Section B, to the contrary, pricing is based upon the individual list prices for each journal minus an across-the-board discount (such as for volume) that applies equally to all of the subscribed journals. Jonak Decl., Exs. Exs. F-K (highlighted examples of ESAs). Revenues for other, unrelated journals simply have zero relevance to CYSR.

### D.    The Discovery Sought Would Be Unduly Burdensome to Produce

Lindsey claims, without any basis, that producing subscription revenue data for other journals would be simple for Elsevier. That is not true. For comparison,

18

Elsevier spent 120 managerial-level hours to prepare and produce the initial report, which is the equivalent of 1,458 pages even in a shrunken font.  de Vos Decl., ¶ 7. It required Elsevier to retrieve, compile and reconcile data from multiple systems. *Id.*   For years earlier than 2008, the data is stored in a retired database system that would require reconstruction and manual reconciliation, and countless additional hours.  Producing the requested data would be immensely burdensome and unjustified. *Id.*

### E.     There Has Been No "Sandbagging" – Elsevier Has Consistently Objected That Subscriptions to Other Journals Are Irrelevant

Throughout this litigation, Elsevier has always taken the position that subscriptions to other journals are irrelevant, and has never agreed to produce these. The history of discovery confirms this.  Discovery was initially phased so that Elsevier could produce certain, discrete information through custom reports that the parties could then use to have settlement discussions.  (Dkt # 24-1, ¶¶ 2-8) The parties memorialized this in their Joint Discovery Plan.  *Id.*  Elsevier produced every one of the reports promised, and indeed, produced more than what was promised in the Joint Discovery Plan. *Id.*

Despite this, once Lindsey reviewed the data and realized that the revenues fell far short of his expectations, he began seeking other sources of revenue to enlarge his claims.  He served discovery requests and filed two motions to compel, arguing that he should be entitled to discover information about subscriptions to other journals.   Those motions were **denied**, including one of the motions specifically seeking this data.  (Dkt # 37)  In ruling on the motions, the Court specifically held that "discovery is limited to 'any nonprivileged matter that is **relevant** to any party's claim or defense and proportional to the needs of the case . . ."  (Dkt # 37, p. 3) (emphasis in original)  The Court cautioned that it would consider cost-shifting if discovery appears unduly burdensome or expensive. *Id.*

1    Lindsey also omits the full history of meet and confer and discovery in this

2    case, which make it clear that: (1) Elsevier never agreed to produce data for

3    products unrelated to CYSR, (2) Elsevier provided Lindsey's counsel with

4    spreadsheets of the data it was willing to produce, namely, revenues for

5    subscriptions to CYSR and products that contain CYSR content (Collections); (3)

6    Elsevier's counsel repeatedly referenced these spreadsheets and asked Lindsey's

7    counsel to let her know if they had any issues with the spreadsheets; and (4)

8    Lindsey never raised any issues with the spreadsheets or sufficiency of Elsevier's

9    production as to revenue data until July 19.  Jonak Decl., ¶¶ 7-21.  If something

10   needed for Lindsey's expert reports was missing from the September/October 2016

11   and June 7, 2017 spreadsheets, why did Lindsey wait until July 19 to raise it?

12              **F.    Lindsey's Request For a Further Extension Should Be Denied**

13              There is no legitimate reason for delaying the current schedule based on the

14   issues raised in Lindsey's motion.  The data that he seeks is completely irrelevant,

15   constitutes trade secrets, and would be burdensome to collect and produce.  With

16   regard to Elsevier's 2016 citation data being delayed, the 2016 citation data will not

17   be audited until August 2017, but Elsevier offered to produce an interim report with

18   the unaudited citation data through the end of 2016. Jonak Decl., ¶ 26.  This is

19   hardly grounds for delaying expert reports, where new data will constantly become

20   available until this matter gets to trial, and where Elsevier has already produced

21   several years of detailed citation data that Lindsey's experts can use.  *Id.*  Lindsey

22   also falsely suggests that Elsevier is withholding pre-2009 usage data.  At this

23   point, Plaintiff has already taken abundant discovery and has no excuse for delay.

24   Jonak Decl., ¶¶ 27-29.  Elsevier is not withholding data on CYSR subscriptions or

25   Collections revenue.  The only discovery in dispute is for subscription revenues to

26   other journals that have **nothing to do with CYSR and are not sold as a**

27   **"package" with CYSR**.  Such discovery is not relevant and Lindsey's motion

28   should be denied.

1

2                                        Respectfully Submitted,

3    Dated: July 31, 2017

4                                        BOGATIN, CORMAN & GOLD

5                                        JONAK LAW GROUP, P.C.

6
                                     By    /s/ Jennifer L. Jonak
7
8                                        JENNIFER L. JONAK
                                         Email: jenny@jonak.com
9
                                         *Attorneys for Defendants Elsevier Inc.,*
10                                       *Elsevier B.V., and Elsevier, Ltd.*

11

12

13                                       VALLE MAKOFF LLP

14                                       GREG VICTOROFF & ASSOCIATES

15
                                     By _____ /s/ Jeffrey B. Valle _____
16
17                                       JEFFREY B. VALLE
                                         Email:  jvalle@vallemakoff.com
18
                                         *Attorneys for Plaintiff Duncan Lindsey,*
19                                       *Ph.D*

20

21

22

23

24

25

26

27

28

JOINT MOTION RE DISCOVERY DISPUTE RE FINANCIAL DATA AND DEADLINE FOR
EXPERT REPORTS  -- 3:16-CV-00959-GPC-DHB

1

2                           **SIGNATURE CERTIFICATION**

3

4          Pursuant to Section 2(f)(4) of the Electronic Case Filing Administrative

5    Policies and Procedures Manual, I hereby certify that the content of this document

6    is acceptable to Jennifer L. Jonak, counsel for Elsevier Defendants, and that I have

7    obtained her authorization to affix her electronic signature to this document.

8

9

10

11                              By    _____/s/ Jeffrey B. Valle_____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT MOTION RE DISCOVERY DISPUTE RE FINANCIAL DATA AND DEADLINE FOR
EXPERT REPORTS  -- 3:16-CV-00959-GPC-DHB